Case number 24-1291, et al., Travis Dardar, et al. Petitioners for the Federal Energy Regulatory Commission. Mr. Matthews for the petitioners, Mr. Edgar for the respondent, and Mr. Tanaka for the interviews. Mr. Matthews, I think this should have made you feel comfortable. Thank you, Your Honor. Good morning, Your Honors. May it please the Court? Nathan Matthews on behalf of Petitioners Travis Dardar, et al. I'd like to save three minutes for rebuttal. The CP2 LNG terminal is the eighth and largest liquefied natural gas export terminal that FERC has approved along Louisiana's Calcasie Shipping Channel. The terminal will emit thousands of tons per year of criteria air pollution. It will have severe impacts on local fishermen, and it will emit more than nine million tons per year of greenhouse gases. FERC's analysis of those farms violated the Natural Gas Act and NEPA. Today, I'd like to focus on three issues. First, FERC's failure under Section 3 of the Natural Gas Act to explain how it determined that the project was consistent with the public interest. Second, FERC's cumulative effects analysis was deficient under NEPA because it emitted foreseeable and consequential sources of pollution. And third, FERC's conclusion that fishermen would not be significantly impacted was arbitrary. Under the Natural Gas Act, FERC failed to provide a reasonable explanation for its conclusion that the project's harms did not cause the project to be contrary to the public interest. At the threshold, FERC can't pass judgment on those harms without knowing what they are. So, as this court held in Decinos, a finding that FERC's NEPA analysis was deficient also undermines FERC's Natural Gas Act analysis. But independent of the NEPA issues in this case, FERC's Natural Gas Act conclusions were themselves unexplained. This court has consistently held that environmental impacts are pertinent to the Natural Gas Act public interest inquiry. And FERC did not argue here that these kinds of harms were not the type of harm that could cause a project to be inconsistent with the public interest. So, FERC's conclusion necessarily rested on a judgment that these harms were not severe enough to cause the project to be inconsistent with the public interest. But that judgment of severity requires some sort of yardstick to measure the harms against. We argue that the appropriate metric would have been to measure the harms against the project's benefits in some sort of a balancing test. If that's true, every time you introduce harms and there are always harms, then what's the presumption in the statute work? That it puts the burden on the project opponents to provide that evidence. No burden if there's always some harm. The other option would be for FERC to identify some sort of threshold that the harms are due to meet. So, here, however, we argue that not only were there harms, but that the harms were not de minimis. And FERC agrees. If you're going to, in some way, have to measure the harms against the very strong presumption that these projects are in the public interest, it can't just be any kind of ordinary balancing or, like, balancing under Section 7. Would you agree with that? I don't know that I do, Your Honor. I think that... Section 7, you don't have a big weight on one side of the scale. I mean, even accepting your balancing. I mean, at some point, they have to decide whether stuff overcame the presumption or not. Call that balancing or measuring or whatever you want to. But it just feels like, to talk about, as soon as some harms are identified, them having to weigh everything, sort of, right out of the analysis, the weighty presumption in favor. You know, there really has to be something affirmatively, not just contrary to public interest, but so contrary to public interest as to outweigh the very heavy public interest in favor of these projects. This is what Congress has dictated. I think that that may overstate our interpretation of what Congress has said. But whatever that line is, FERC needs to identify where it is. And we haven't... So even if this analysis... It's not going to be... I mean, I'm not sure how you would articulate that in some sort of across-the-board rule in any given case. They're going to know that there's an extraordinary amount of weight on one side. But how... I don't know how they would... I mean, do you have in mind... You only talked about balancing in your briefs, as I recall. Do you have in mind some form of... No. ...test that could be... I can't imagine what a Bright Line tester rule would be. If you have six environmental harms, they can't do it because they could all be small ones. No, I think that counting how many types of issues would not be an appropriate way to do it, Your Honor. Well, so we argue that balancing is the best reading of the statute because we can't come up with another interpretation. But it's... You don't get to balance... I mean, if you just think of scales, you've got sort of a bowling ball on one side. You know, there's nothing even to balance until you have an extraordinary amount of weight on the other side. At first, just deciding, whatever you've got here, it's not enough to sort of lift the bowling ball off the table. So... I don't know if that's balancing or not, but it seems to me sort of the world in which Congress has left us. So I have two answers to that, Your Honor. The first is we introduced evidence indicating that this project may put an important local industry or cause the demise of an important local industry and that it may cause hundreds of foreseeable premature deaths and other adverse health impacts. So even if there is a bowling ball on the other side of the scale, I don't think that it's self-evident that the harms we identified here are insufficient to lift that bowling ball. The other response that I had, Your Honor, is that I do dispute the premise that there is a bowling ball on the other side of the scale. That Congress set out a presumption favoring X4. It just put the burden of introducing harms onto the project opponents. It's a burden shift. It is said that there is this weight on the other side. We've already decided. It's not just a burden shift. We've already decided that there's a public interest in doing this. Well, one of the arguments we offered to FERC that the FERC refused to engage with was that even if exports, were they to occur, would have provided public benefits, that there was not need for this particular terminal because there was a glut, frankly, of U.S. export products. FERC did not engage in that. We have not briefed whether that is true or not. Mike just seems to be quibbling with the Department of Energy's decision that this export is conclusively in the public interest. The only approval that was made here was for the free trade agreement, Your Honor. And the Department of Energy concluded that relying on the burden shifting, the Department of Energy finds that exports will not be harmful. It does not find that they are affirmatively beneficial. So I understand that you disagree. Congress has said when it's an export to a free trade agreement country, that is in the public interest, and you will authorize the Department of Energy. I will. I think that's right. That is correct. The Congress has said that the U.S. cannot decline to export or reject exports to nations that have a certain type of free trade agreement that requires non-discriminatory. We just see whether or not there's a sufficient market for those exports here, but that is getting very far beyond the four corners of this case. Right. For purposes of this case, we would argue that even if there is a bowling ball on the other side of the scale, that the harms here were sufficient to lift that, or at least that FERC didn't explain why these harms weren't sufficient to lift that, and that these are harms that, from our perspective, don't appear to be de minimis. We argued in the brief that they were not, and FERC did not say, oh, yeah, those were too trivial to count. FERC said, yes, there were harms, and we considered them. And our argument is that, well, what did that consideration look like, or what would we have to show in some future case? FERC definitely considered them and said, we don't think these harms are as big as you think they are. We don't think it's going to wipe out the industry. We don't think it's going to have sort of these consequences and that consequences. And I get that you disagree, but that's a different argument than we need to have. So FERC has said that it doesn't believe that this project is going to wipe out the fishing industry. FERC did label the impact of criteria air pollution as insignificant. FERC did not disagree about the greenhouse gas emissions. FERC explicitly said, we don't know whether or not these emissions are significant or not. FERC did identify that the emissions here would consume a large proportion of Louisiana's stated goal for reducing emissions and might interfere with Louisiana's ability to achieve its own goals in the future. And FERC did not say whether that was a problem or not. And FERC did use the social cost of carbon to say that these would cost, I think the central estimate was $8 billion in harm. FERC says it's not relying on that. But FERC didn't, conspicuously refused to say we think that the climate harms here are insignificant or de minimis. All of that. I'm not sure that just north of de minimis is enough to overcome the strong statutory presumption. I think that the preventing a state from achieving its policy goals and causing billions of dollars of harm is farther than just north of de minimis. I'd like to, the other part of our argument of. If we consider the harms as FERC found them to be, I understand you disagree. That's almost a factual dispute. But if we take the harms as FERC considered them, is that enough in your view to overcome the presumption? Or do we have to accept the facts as you understand them? I think that even if the court accepts the facts as FERC found them, that FERC did not explain why these harms were not sufficient to overcome the presumption. I think that that is clearest for the climate harm. And that this case is indistinguishable from New Jersey Conservation Foundation versus FERC. Where this court similarly held that FERC has to provide some explanation as to how the climate harms factored into its analysis. And as Commissioner Clements noted in her dissent, that FERC did not provide that explanation in any way here. I also think that even for the other, the non-climate harms, which FERC labeled as insignificant. That nowhere in the record did FERC argue that a harm that is labeled insignificant for NEPA purposes is insufficient to move the needle. Or have any possibility of tilting the balance when it comes to the Natural Gas Act public interest analysis. So perhaps FERC could have said that. We likely would have disputed it if FERC offered that as a rule. But FERC did not say that in the record here. Which is part of why we think FERC's argument is unexplained. I see that I've used quite a bit of my time. But I would like to talk about the NEPA side of it. Of what the facts are separate from the FERC framing of how it would analyze the facts. Thank you, Your Honor. On the air pollution impacts, FERC's analysis of even the terminal's individual direct air pollution rests on a cumulative impacts analysis. Here, the terminal will emit thousands of tons per year of air pollution. FERC found that the air pollution impact on ambient air quality would be 20 times the significant impact level for nitrogen dioxide. But FERC said we're not worried about that because the cumulative impacts will be insignificant. That cumulative impacts judgment was arbitrary because it excluded sources of emissions that were both foreseeable and potentially determinative. Where FERC had included them in its analysis, FERC would have predicted an exceedance of the national ambient air quality standards. The first of those sources is the Magnolia LNG terminal. Magnolia is already within whatever manageable line FERC can draw here. The environmental impact statement included Magnolia. Magnolia is closer than the radius that FERC defined as the geographic scope of potentially impactful cumulative impacts analyses. And in the EIS here and in the other recent NEPA analyses that FERC has done for the area, where every time FERC has included Magnolia, FERC has concluded that ambient air quality will exceed the NAAQS. So this is not a case where the project is distant or too small to matter. The decision to exclude Magnolia is. It may not be geographically distant, but it is, in fact, its very existence is not yet established. It hasn't been built yet. It has not been built yet. And now, unlike at the time of EIS, it now lacks a permit from Louisiana. Well, it is black letter NEPA law that projects can be reasonably foreseeable for purposes of cumulative impact analysis. Actually, I mean, usually, I mean, you make a lot of the fact that FERC has authorized Magnolia project from embedding. I haven't seen that authorization order that includes pretty standard language that subject to obtaining licenses, needed licenses from the state. And Magnolia doesn't have. That's frequently true, Your Honor. And the standard under NEPA is reasonably foreseeable, or whether the impacts are reasonably foreseeable. We had a license, and the license expired. And, again, not a brick has been laid for the project. And, I mean, at this point, FERC would have to say, we're going to sort of second-guess Louisiana's decisions to not have issued a new permit, the one expired, and that, at some point, this will now get built, which I think they've now asked for an extension until 2031. I can't confirm the date, Your Honor, but they have asked for another extension from FERC.  And so this, I mean, just feels like we don't know if they're going to get the permits from the state. The state's not including it on its list for a sensible reason. And this thing is far, far away from being built, let alone operating. So, Your Honor, the state did not pass any judgment about whether or not the terminal is likely to be built, whether they're likely to reapply for the permit, or whether they'll get it. The state just automatically says, we only include projects that have their permits in our inventory. For NEPA purposes, it's black-letter law in this circuit. We cite Theodore Roosevelt, the case that's in our brief, that a project can be reasonably foreseeable, even if it does not have all the permits it needs. It can be, but not must be. It can be, but it's going to depend on circumstances. And I was just trying to explain to you why I think some of the circumstances here seem to fall within the realm of FERC's judgments, relying on state regulators' compilation of what's functioning in the area, what's operating in the area that's producing pollution, and what is completely contingent. Well, but FERC has agreed consistently that contingent projects can still be reasonably foreseeable. All contingent projects? No, no. Not all. I mean, it has to be reasonably possible. But, I mean, the way FERC articulates the standard in the record is that FERC points out that a project can be reasonably foreseeable for NEPA purposes, such that FERC is required to consider it, even if it does not have permits yet. FERC states that in one of the rehearing orders, in JA 253, paragraph 184. And the EIS repeatedly states that the scope of cumulative impact analysis is supposed to include projects that are approved, proposed, or planned. That's at JA 559-60, again at 562, again at 584. So the standard is for reasonable foreseeability, like, can encompass projects that do not have a permit. And in the record here, and in the briefs, FERC never argued that the fact that Magnolia does not have its clean air permit, and will need to renew that, keeps Magnolia from being reasonably foreseeable. The Magnolia section of FERC's brief does not include the terms reasonably foreseeable in it. FERC just says we reflexively followed the LDEQ inventory, which is not what FERC does in other contexts. I mean, even in this case, FERC takes the LDEQ inventory as a starting point, but recognizes that NEPA requires FERC to consider sources of emissions that LDEQ doesn't. Unreasonable. I mean, certainly they could look beyond what Louisiana has done. But are they required to do so, at least in a situation like this, where, you know, the FERC authorization has been on the books for quite some time, and things are clearly having trouble getting off the ground because it ran out the time on its first permit from Louisiana, and nothing, as far as I can tell, has been issued since. So it looks like, you know, the question, you'd have to have a rule where they must, anything that FERC has authorized must be included, otherwise this one just seems to be a compilation of factors that make it less reasonably foreseeable what's going to happen with Magnolia projects. I am not aware of any case that has held that the agency could exclude a project that is already authorized. You'd have to have a rule that says they must. I disagree, Your Honor. Where they said, look, this thing has expired, and nothing we authorize can go anywhere without these permits. We don't know what's going on. The thing hasn't even been built yet. We're going to trust Louisiana's list of relevant sources. So my first response to that is a Chenery argument that FERC never argued that Magnolia was no longer reasonably foreseeable. FERC just argued that it shouldn't have to do work to add sources to the LDEQ inventory. Had FERC argued that there was some reason to doubt that Magnolia would go forward, we would have disputed that. But that's not an argument made anywhere in the record or in FERC's briefs. I was just trying to see, your point then has to be that it's unreasonable for them to rely, without doing extra homework, on the state's reports. I mean, was Magnolia the only change on the LDEQ list between the EIS stage and this one? FERC hasn't identified other specific ones.  No. I mean, it seems like, in fact, there were a lot of changes, and you just have this one. This is the most consequential one that we've found. But under your theory, every single one of those changes would have to be investigated by FERC. No, Your Honor, because what's different about Magnolia is the fact that there was other evidence in the record already demonstrating both that Magnolia was foreseeable and that it was consequential. We don't know that any of the other changes in the LDEQ inventory were likely to have mattered here, but we have four other recent FERC analyses that say if you include Magnolia, the cumulative air quality is likely to exceed the national ambient air quality standards. So... But if it might be that you included six others that were omitted, that also... That would be a problem for FERC to confront if there was evidence that some of those other sources were still foreseeable. I think that the other issue about Louisiana saying that – or, I mean, about FERC saying that this could be Louisiana's problem is that it's not clear that FERC is going to have another opportunity to address Magnolia. And as this court held in Healthy Gulf, projects may have air pollution impacts that are pertinent to FERC's natural gas determinations, even if those projects do not violate the Clean Air Act. So FERC can't assume that whatever Louisiana does is going to solve any problems that FERC might have wanted to consider. Another example of that would be that if including Magnolia means that CP2's contribution ends up exceeding the significant impact level and being significant even if Magnolia's does not, that would enable Louisiana to approve Magnolia, but no one would be able to reach back and say, oh, well, we shouldn't have approved CP2 then. So I think that there are important reasons why this is FERC's chance to consider the cumulative impacts of the project that FERC has already authorized. FERC never engaged with the pertinent legal standard of reasonable foreseeability, even though FERC has consistently stated in the record that the scope of cumulative effects impact is supposed to include all reasonably foreseeable projects and the projects can be reasonably foreseeable even if they don't have all of their permits. And again, FERC has never argued that the decision whether to include Magnolia or not could be determinative. I mean, nor could FERC have made that argument. We have all of these other FERC analyses that show if you include Magnolia, FERC's conclusion about the NAAQS not being exceeded is undermined. So here's what the agency said at the right about this very issue. Magnolia LNG currently has no error permits in place, but there's no record evidence explaining why Magnolia LNG's error permits have allegedly expired. Therefore, we will not speculate as to the reasons why and instead grant the LDEQ, the state agency tasked with implementing the act, a presumption of regularity formed by general principles of administrative law. So they didn't say it's not foreseeable. They did say it's speculative. Why isn't that what we're looking for? NEPA requires reasonable forecasting and speculation. Reasonable, foreseeable, and speculation are opposites, right? They're non-overlapping. I think there's a difference between FERC saying that they don't know why the error permit lapsed and concluding that the project as a whole is unforeseeable. I didn't say it's unforeseeable. Well, I think that is part of the – they say that the – It's speculative. It's not foreseeable. I'm sorry. Can you tell me what language you're looking at, Your Honor? Let's see. Give me a moment. My clerk can get it before I can. He's on the way. JA355. That's paragraph 15 at the bottom. I'm grateful, Your Honor. Thank you. So FERC is – I think that FERC will not speculate as to the reasons why the permit expired. FERC does not – refusing to speculate about that is not a judgment that the project as a whole is speculative. How can the project go forward without the permit? Well, not knowing why it expired doesn't say that they have any doubt as to the fact that the permit can be renewed, nor is there any evidence in the record here casting doubt on the idea that it can be renewed. If FERC thought that that issue was potentially salient, this Court held in Berkhead v. FERC, that FERC has an obligation to at least attempt to seek out pertinent information. So if FERC thought that the reason why the permit expired was important, FERC needed to ask, and FERC's refusal to say we're not going to speculate about that. Apparently their practice in this regard is consistently to rely on the state inventories. No, Your Honor. And there's a proceeding immediately after this one in which, again, ad mignoli was included, I believe, but, again, it was based on the state inventory. FERC's practice is to start with the state inventory, but FERC supplements it in recognition of the fact that FERC's NEPA obligations are broader. So here, for example, FERC started with the LDEQ inventory. FERC then held that FERC needed to consider the effects of the ships serving both the CP2 terminal and the CP1 terminal. We argue about the other ships serving other terminals, but FERC agreed CP1 and CP2 needed here. FERC knows that those aren't in the LDEQ inventory, but FERC said we're going to supplement the inventory to include those ships. FERC similarly— Are they not in the inventory because— Because the LDEQ's inventory only includes stationary sources. All right. So far as the inventory isn't relevant, they take a look. That's correct, Your Honor. It's irrelevant if it doesn't cover that type of source. So I think that the same argument of we're supplementing the inventory to include mobile sources because mobile sources are relevant but not included in the inventory is exactly the same reason why FERC needs to supplement the inventory to include proposed but not yet approved sources such as Magnolia, which has been approved by FERC. It just hasn't been approved currently by LDEQ. Just on the supplementing the inventory point, I want to say it's not just about ships. FERC also supplements the LDEQ inventory to include emissions from the construction of other FERC projects because LDEQ only looks at operational emissions and FERC's— Presumably, Louisiana could require all kinds of emission protections before issuing that permit. It would completely change the calculus unless FERC is supposed to talk to the state about why they're off, talk to them about what they plan and tend to require this new project to do or not to do. I'm just not quite sure how they're supposed to game this one out. I think FERC has consistently stated that its cumulative effects analyses need to consider projects that have not yet been approved. And I don't—there's nothing in the record here indicating that the project before Magnolia is anything more than doing some paperwork to renew a permit that already expired. If there was any evidence at all indicating that when LDEQ reissued the Magnolia permit, that the emissions or other mitigation would change, that might make this a closer question. How do you know that's not going to happen? We don't, Your Honor, but FERC needs to engage in— It's either a different question or it's not, but we don't have the information. What—I mean, FERC needs to engage in reasonable forecasting. Even if FERC had some doubt as to the exact contours of Magnolia's emissions, the project is still going to emit something. You know, and if FERC is off by 5 percent or something, that's not the same. It would be closer to include FERC's prior estimate of the emissions, which FERC has relied on in multiple of the proceedings, rather than to just assume that a project that FERC has approved is actually not going to go forward. Some sort of reasonable forecasting needs to happen here. And again, there is—we are well beyond anything that FERC argued in the record. There is nothing in the record suggesting that Magnolia will, in fact, emit anything other than what FERC already predicted that it will emit. I'd like to give you a couple minutes to talk about the fishing industry. Thank you, Your Honor. Let me go through some of these declarations by, for instance, Anthony Theriot, I think, who says that when Venture Global did its first facility, the shrimp catch decreased by 47 percent. Yes, Your Honor. And another fellow, just since July of 25, has moved out of the area, because after the dredging incident or accident from August of 25, it went from difficult to essentially impossible. There are little to no more shrimp to catch inshore, and some of the best oyster beds are buried in sediment. So, go ahead. Thank you, Your Honor. So, yes, as you noted, local shrippers or fishermen—mostly fishermen, meaning shrippers or crabbers, mostly here—have noticed serious declines in their catch since the commencement of construction of other projects along the Kalkasoo Shipping Channel. I understand that we have a firing line availability still, but my understanding is there's something unique about where all this is being built with respect to shrimp. Part of that is the firing line situation, of that this is the narrow portion of the channel that is south of the firing line where the shrippers can catch year-round, which they depend on for their income. FERC's statement in its brief that impacts near the terminal are unimportant because there's 25 miles of channel ignores the fact that the channel above the firing line is not available and the fishermen need to make income year-round. The fishermen have also stated that the area within the region south of Ireland, the area closest to the terminal, is particularly productive. That is where they get the best catch. They've established that they need these places, that they're already suffering a significant decline in their income. Is it too late? No, Your Honor. I mean, they're still there. Many of them are still there and are very attached to this way of life, and so long as they can eke it out, would like to remain. But the concern here that they've advanced to FERC is that they may not be able to hang on that much longer. And so the particular impacts are from project construction. Construction of this project is estimated to take a combined four years. The shrimpers are particularly concerned about the dredging impacts, as they are speculating is part of the reason for the short-term decline or the immediate decline that they've observed. Dredging is not over. That is still ongoing. So, no, this issue is not moved in that sense, if that's what you're asking, Your Honor. There's something in the record about the shrimp, once they leave, won't come back. Is there anything—am I right about that? Is there anything countering that? Is it true? The FERC's position is that the shrimp will come back. We have argued that if the shrimpers leave, they won't come back, that if these businesses stop remaining viable, even if the shrimp were to come back, that there would not be anyone left to rebuild a shrimping industry or that it would be permanently diminished. I don't believe that we've argued that there's a risk of the shrimp— that they're never being trimmed there anymore. Okay. Well, if there's an opportunity, there'll be people to take it. It will not be—even if that's true as a general matter, it's unlikely to be these shrimpers, so the particular fishermen represented here.  All right. We'll give you some time. Thank you, Your Honor. Mr. Edgar? Thank you, Your Honor. Good morning. Good morning, Your Honors. May I please support? I'm Scott Edgar. I'm appearing on behalf of the Federal Energy Regulatory Commission. Thank you for hearing this case this morning. This case did not follow the normal course. I'm going to make a few brief comments about the procedure. Following the authorization order in June 2024, this court made pronouncements in the Healthy Gulf case and Port Isabel. Based on those cases, my friends filed rehearing requests that the commission addressed in November 2024. The commission at that point halted the authorization and asked for additional information and issued supplemental environmental review, which included a draft, which included an opportunity to comment, which was the fifth opportunity to comment in this proceeding for the public, and then another round of orders and rehearing order. I think that procedural history demonstrates three things, that this commission takes its nuclear responsibilities very seriously and that it carefully engages with rehearing requests, and finally it takes the pronouncements and guidance of this court very seriously. In addition, I'd like to now move into the public interest discussion that we just had. While I'm here on Healthy Gulf, I take your point that there they were dealing with sort of step three analysis, but the logic of the language, I'm trying to understand how you read it, doesn't have anything to do with which step you're at. What they found was arbitrary was that FERC said they found the effects of insignificant emissions would not be incremental. In other words, the commission said that because the project's incremental effects were insignificant below the SIO, its cumulative effects were too. That is a non sequitur. I'm on page 1044. Why does that analysis not apply just as much here? The whole point of cumulative is not that you go, that's a little bit, that's a little bit. It's that you add all the little bits up together. Fair enough, Judge Millett. And everything I'm about to say is I'm cognizant of the theory underlying cumulative effects. And I understood 1,000 cuts, and then you've really, you've got something. 1,000 additions, I think. Fair enough. What was going on in Healthy Gulf was something above the SIL. I'm just asking about the language. I understand that's your step three argument. I'm telling you that the rationale, the holding that was given is that it's a non sequitur for FERC to say just because at whatever stage it's below the SIL doesn't mean you don't count it towards the cumulative amount. Imagine you have a baseline amount that's right on the edge, and all it takes is a little more to tip it over. And you go, well, we're not going to look at that little bit. We're not going to look at that little bit. I mean, the rationale of our decision, the reason, has nothing to do and doesn't mention which step they're at. And again, Your Honor, I would go back to the two guidance documents that the commission cites in the footnote, 25 of the May 2025 recurring order, this is June 279 to 280. And what I want to make clear is that these guidance for the step one just didn't apply in Healthy Gulf. We had blown by. You keep arguing that Healthy Gulf involves step three, not step one. My question to you is take that out. Pretend, right? The reasoning, the central reasoning, the holding is that when you have to look at cumulative effects, it's a non sequitur to say, well, that one was small on its own independently because your job is to add things up. That doesn't, so put aside, you can, please, it's not helpful, at least to me, for you to say, well, that was a step three, not a step one. I'm fully familiar with that. But I think it's telling that that, what step they're at, has no relevance and no reference in the core holding, which is cumulative means add it up. And FERC's position is if it's small, we don't have to add it up. That is exactly the same position FERC took in this case. But the facts were different in Healthy Gulf because it wasn't that small. We make legal holdings, right? Tell me why that matters. If the principle of cumulative effects is that you add the new things to the baseline, why don't you add the new things to the baseline in this case? Because, you know, if you were starting with something that was significant or you were starting with something that was about. That's not the rationale of our decision. I mean, I can read it again if I need to, right? It doesn't say. Well, you're already at a high. It says the commission said that because the project's incremental effects were insignificant, which is exactly what they found in this case, correct? Not quite. The incremental effects were insignificant. That's exactly what they found below the SIL, right? In Healthy Gulf, they had asked us so. Because the project's incremental effects were insignificant. Were the incremental effects in this case insignificant? The emissions here were below the SIL for the compressor station, yes. Which makes them, certainly for purposes of EPA, insignificant, de minimis. Right. Its cumulative effects were too, and that's a non-sequitur. I'm just, I'm really struggling with how you reconcile that with this case. Why do you, why does cumulative mean not added up here in the same way it did in Healthy Gulf? The analogy I would use would be a drop in the ocean. And in the case of Healthy Gulf, we started, and I apologize, I do have to read this in the analytical framework, which is the steps. In Healthy Gulf, you were more than a drop. You were more than that in the ocean, dropping the ocean. And so you moved on to the next step. Here, we've got a drop, and we know what the EPA says about the drop. That's split note 25 that I referred to, J279 to 280. And the EPA is saying, we don't even know that that's there. Any further analysis, step two or three, would yield trivial gain. That's not true. Those things weren't true in the case of Healthy Gulf, because we had blown by step one. We had found individual emissions that exceeded those values. Imagine emissions here were right at the next level. They don't exceed it. They are right at it. Okay. Imagine. I know that's not the record here, but imagine they're right at it. Your position is that analyzing cumulative effects could disregard six other de minimis sources that added together go up and take it over the next. I think based on the language of the guidance documents that. I'm asking about the language of our precedent, not first guidance document, our precedent. Excuse me. I should have said EPA's guidance documents that are cited in the footnote. And based on those, were the EPA saying that further analysis would yield trivial gain. And in the case of particular matter, that it would be indistinguishable from inherent variability. That it doesn't make sense, and it's not required to do further analysis. It's just not the analysis that was done in Healthy Gulf. Healthy Gulf had a different situation. I'm asking about the language of our opinion. You must acknowledge that language, but the opinion doesn't seem to embrace what FERC did here. I disagree, Your Honor. I'm asking about the language of our opinion. Nobody's guidance documents. Healthy Gulf was in this analytical framework. Language of our. The language I just quoted to you. Am I misreading it? No, I don't believe so, Your Honor. But the court was dealing with the sectory, and that's. Okay. I'll try one more time, and then I will stop. My understanding is that in Healthy Gulf, we remanded this matter for a better explanation. Correct? That's right. And the explanation that we gave was to point to this guidance, footnote on 279, and elsewhere. I think it was in Sierra Club case where the APA's position was, in addition, the testing is expensive. Or the modeling, I should say, is expensive. And so we don't bother if it's insignificant. Is that the explanation? I think that's correct. And I think that's what the commission is saying in paragraph five of the May re-hearing order. Healthy Gulf says you have to matter. I'm not sure that Healthy Gulf would have said that if it was. Too expensive wasn't going to work in step three. That's a different issue because you've got something. You've got individual emissions that had exceeded the fill in Healthy Gulf. And so you couldn't just dismiss it for that reason. And I think that's what the court was saying. Here, we just don't have that level of emission from the individual. And as the EPA is saying in those guidance documents, it's either diminutiveness, which would yield trivial gain from moving forward. And this is under the Clean Air Act, which is the act that's designed to protect our clean air. And it would be unusual to have, I would think, a stricter rule apply in the case of NEPA and then apply something under the Clean Air Act. And I would move back now to section three. And I do want to engage briefly with the court's discussion about the analysis that occurs under section three. And we do agree that there is a weighty and very strong presumption there. And that the project opponents have not demonstrated that the project is not consistent with the public interest. And the bowling ball analogy, I think, was pretty good. And the project opponents, petitioners, have not demonstrated anything that would. I'm just a little confused about the insistence that no balancing is done here, right? What the commission did is said, there's this steaming clause over here, this public interest thing. So that's our bowling ball or whatever, 10-pound weight or whatever you want it to be. And then it pointed to what it found in the I.S. about mitigation. Well, it pointed to the harms that the petitioners identified and then how they were mitigated. And then concluded, in light of all that analysis, that there wasn't enough weight on the other side to overcome the presumption on the public interest. Is that a fair description of the commission's decision? I think that's fair. Sounds like balancing to me. I don't know why you're still resisting the balancing. It's just it's not a balance that starts with the weights and scales on an even plane. Fair enough. Well, it may be fair enough to you, but the commission said expressly, we don't weigh. We don't weigh the public benefits against potential harms in Section 3, but I don't know how else you figure out that the presumption hasn't been overcome. Can you tell me how? Because it sounds like I had read the opinion. It's doing just as I said. And then I read the commission saying, but we're not balancing. And so I'm trying to understand what they're using and what metric are they using if they're not looking at least at the scales to see if they've shifted at all. I think we're getting hung up on the word balancing, and I would try not to use the word. And I think what the commission did was to what I think the commission was saying in that part is that there is this disclaiming equipoise. And I think that's really what my friends, the petitioners would like to would like to establish is that Section 3 is some sort of equipoise. But as you were talking about earlier, there's a bowling ball on one side. So we're not in equipoise. So to answer your question, what does the commission do? It looks at the language of the statute, and there's not much beyond the commission must make a determination whether the project is inconsistent with the public interest. And it builds a record, and it looks at all of the issues that are raised. Weighs the evidence presented by your petitioners. Correct. Commenters are before the commission. It weighs that. And it obviously is now, and it may then increase or reduce that weight based on its mitigation efforts. But let's say there's no mitigation. It takes that, and then it looks at the weight, the congressional weight on its side, shall we say. And it just says, has anything changed? Has it rebalanced at all? It does what the statute tells it to do. The statute doesn't tell us. It tells it to make a decision that requires it to consider on the one hand and on the other hand. The statute requires the commission to decide whether the proposal is inconsistent with the public interest. And, for example. How would you decide it's inconsistent? If they found, imagine in some case a party comes forward and says, a million people will die within three years. And rock solid evidence. It wasn't hyperbole. Perhaps the commission at that point might say, what, the presumption is overcome? If I can add to your, the proposal were to build the thing next to Manhattan. I'm just trying to get it easy with a million dead people. I don't care where it is. But if you want to put it in Manhattan, put it in Manhattan. There are a lot of people in Manhattan. And that doesn't look like it's in the public interest because there would be alternatives there. The commission would have to do the work. Contrary, you'd have to find it's contrary to the public interest. Correct. It seems to me. I would say you've come forward with evidence that actually outweighs the bowling ball. It sounds like your hypothetical may have done that. But that would be the chart. The commission here is saying, we don't mean balancing ever. We mean, this isn't Section 7 balancing. It's not, as you said, we're not starting in Equipoise. I think it's Equipoise is what's going on here. And I think that's really the name of the game for the petitioners. And that's what the commission was saying is we're not doing that. But the commission would look at, and I would invoke the Keith Ban case that was cited in our brief. There was a case where the proposal would not have been consistent with up-to-date safety regulations. And also a point of this was 2005, I believe. This is a different world. We're importing LNG, not exporting. And we noted that this gas was critically needed. So in the face of that and the congressional, on the scale from Section 3, this commission denied the project because of safety. And so I would add that to the hypothetical judgment that you mentioned. And I can come up with additional ones. But that's simply the work of the commission. So once the petitioners have presented evidence of harms and it's supported, your task, commission's task, is to determine whether that is sufficient to rebut the presumption. Correct? I think that's right. And to say that it is still, that this does not show the inconsistency with the public interest. I don't know what you can say that would satisfy an outsider saying, like the court, saying, well, why doesn't it meet that threshold? That seems to me that's a judgment that is either committed to the agency or I don't understand it. It is committed. It is within the commission's discretion. And I think here on review, I'm sorry, Conor. Well, I said the petitioners would have to have substantial evidence to show the harms. Does the commission have to have substantial evidence to show that it is still in the public interest to go forward? Yes. And I think we're here under the APA and under a standard of review. And I think the record here, of course, the commission did make the finding. The proposal here is not inconsistent with the public interest. We believe that there is substantial record evidence to support that determination. Just a couple of examples of what you're drawing on in the record that the commission drew upon, I should say, in saying that that wasn't sufficient to show inconsistency. The commission, so I mentioned the key span case. The commission addressed safety and the authorization order, paragraph 30. This is J.I. 15 to 16, and found that the project would comply with current safety standards. The commission talked about arms-length contracts in the next paragraph, and that the terminal would be responsible for, the terminal sponsor would be responsible for recovering all costs. And the commission also addressed, so as a backing up in paragraph 29, J.I. 15, recognized that there would be some impacts that are significant, in particular visual impacts, but most would be non-significant and reduced to below significant levels through mitigation measures. And the commission here adopted 137 conditions, many of them with multiple subparts. And so the commission didn't simply take what the project sponsors brought in the door. We did a great deal of work through the EIS and the supplemental EIS, resulting in the authorization as conditioned. Thank you. Any more questions? All right. Thank you. Thank you. Mr. Kanopka. Good morning. Thank you, Your Honors. Good morning. Before Chair Kanopka for the interveners, I actually just wanted to pick up where Mr. Edgar left off and just reiterate the thoroughness of the commission's review. I mean, not only did the commission issue a 650-page EIS, a supplemental EIS, responded very thoroughly to all of Petitioner's arguments here over the course of its authorization order, its first, second, third, and fourth rehearing orders over the course of multiple years, and ultimately, as to the Section 3 question, considered all of the evidence, considered all of their arguments, and found that the presumption was not rebutted and that there was nothing in the record to show that it would be inconsistent with the public interest to build the terminal. Same thing for the pipeline, which they haven't emphasized here as much today. Does the Magnolia Project have its permit now from Louisiana? It does not. My understanding is Magnolia allowed its permit to lapse. It has not renewed it. And if it were to renew it, it would actually have to conduct a new error analysis that would include CP2 and any other stationary sources that are permitted in the Louisiana area. We're not going back to FERC at all? Setting aside, I mean, as Your Honor noted, there is a FERC proceeding pending to extend the construction authorization to 2031, and there could be additional proceedings there. I don't know. I'm not fully up to speed on all of that, but I can imagine that there might be objections or additional arguments that might be made before FERC that FERC needs to do additional analysis to authorize that continuation of its own Section 3. So whatever emissions come from this project will be part of the cumulative analysis for that project? That's correct. That's my understanding. Sorry, is there going to be another? That's only if there's another NEPA analysis. Well, there will at least be another PSD analysis for the Louisiana permit, prevention of significant deterioration. That's the Clean Air Act analysis. Before FERC or before EPA? That will be before the Louisiana Department, which is the same sort of analysis that FERC relied on in its orders here. Is the PSD done only in non-attainment areas? It's the opposite. The PSD is not just in attainment areas. There's a different analysis that's done for non-attainment areas. Your Honor, Judge Millett, I know you raised some questions about maybe the difference between Step 1 and Step 3, and I just want to emphasize that the way that they're used is different. Step 1 of the PSD analysis is really, it's there. What you're doing there is you're determining the maximum model concentration for that particular source, and it's really a screening step where you say if it doesn't meet the SIL at the first step, then it sort of has no potential to cause or contribute to a cumulative impacts problem, and so we're not going to require additional analysis. At Step 3, I think as Mr. Edgar was alluding to, the analysis has already found that there would be a cumulative impacts problem, and the question then is whether this particular increment is a contribution to that problem, and so the SIL in that context is being used for a somewhat different purpose. I understand the different steps. It's just the language that's used there about what it means to analyze cumulative effects and that it includes ones that you can't get out of adding them up just because they're insignificant. I'm trying to reconcile the posture of that case with the language of that case. Yeah, and I think obviously the difference here is we never reached Step 3 where that language came into play, and if you look at the Commonwealth case that was at issue in Healthy Gulf on remand, FERC actually did redo its Step 3 analysis, found that there could be some impact, and then reauthorized the project, notwithstanding the potential impact there. If we had gotten to Step 3, we assumed that FERC would have engaged in similar analysis as to this project and reauthorized it. Do you dispute that this project continues to go forward, that a number of these shrimpers are going to be driven out of business? I do dispute it, and I think more importantly, FERC found that in fact there are plenty of other areas to fish, such that there would be no significant impact on the commercial fishing industry. And I think, you know, I don't necessarily want to get too in the weeds, but as to this, what FERC was saying is that the impact of this project on fishing is going to be most significant where the terminal and where the dredging will occur, but there are lots of other areas in the Calcasieu Ship Channel and south of it that are available to fish. Their argument is this one is kind of a Grand Central Station for the shrimp. They're coming in from different directions. They're traveling through or... So I think there's two things going on if you look at the record. There's indications about concerns about shrimp migration, which happens two two-week periods out of the year, mostly at night, and FERC concluded that in part because it happens mostly at night, that it's really not going to be affected by this project because tankers don't generally pick up and deliver at night. In addition, the area where the migration mostly occurs is at the firing line, which is two miles north of this terminal, so there's all that extra space to shrimp. In addition... Is dredging happening there, or is dredging only happening... Is dredging happening near this firing line within the vicinity of it? I believe that the dredging is happening kind of concentrated around the terminal, which is two miles south of where the firing line cuts off. And the firing line, I think the other thing that sort of contributes to FERC's analysis of this, is that the area south of the firing line is actually pretty vast. It follows the entire coast, and then it's only just this little bit that goes up into the Calcasieu Ship Channel that was added as of September 2018 that could potentially... They're really talking about here, but there's lots of other areas for them to shrimp. The last point I would just make is just by way of update for things that didn't make it into our brief. The phase two of this project has reached final investment decision, and there's over $20 billion of financing. Construction has started. It's very important, especially given events in the Middle East right now. I think 20% of the global LNG supply is offline, and this facility is anticipated to start delivering or exporting LNG as early as next year. And so this is really filling, notwithstanding petitioner's arguments to the contrary, this is actually a very important project to go forward, and it is filling a very important market need. All right. Thank you. Thank you. Mr. Manson, why don't you take three minutes? Take me a couple of minutes to get there? You need help getting it down. Thank you, Your Honor. I'd like to briefly address the Section 3 issue and then the Healthy Gulf issue. On Section 3, petitioners do not argue that the standard is whether the harms and benefits are equitable. We also do not dispute that there could be a bowling ball or some other weight on one side of the equation. We also aren't arguing that it needs to be some sort of mathematical cost-benefit analysis. The argument is just that there needs to be some comparison of harms to benefits, because when the project is going to have harms, FERC needs to explain why those harms are worth it and why the project is justified. FERC really did do that here. It spent a lot of time saying we don't think the harms are at all as consequential as you do. I take it that you disagree that you haven't sort of challenged those factual findings as lacking substantial evidence. Our NEPA claims are a challenge to the claim that the harms are inconsequential. I guess as part of your Section 3, I didn't understand you were doing that. I guess it's a little confusing when you say it sort of relies on the NEPA claim. Maybe you're pushing that that I misunderstood. Regardless, we would have to find that FERC was sort of factually wrong. For you, when on Section 3, we would have to do two things. We would have to say FERC was factually wrong to think that they weren't as significant, at least with its 150-whatever mitigation efforts, that they still existed factually. FERC was just wrong to think that with the mitigation efforts, they don't carry material weight. And then say you're factually wrong about that. You don't have substantial evidence to support it. And having those harms is enough to overcome Congress' identification of public interest in Section 3. We'd have to do both of those things. And I think we have, Your Honor. I think that we- Ah, because your NEPA argument all I could see was some more NEPA, right? No, because the NEPA- And so it's- So the- I'd like to clarify that our Natural Gas Act argument includes an argument that if they redo the NEPA analysis and discover that there are significant harms, then they need to redo the Natural Gas Act analysis to decide whether- That's in Section 3, though. That is, yes. Section 3 or Section 7? What are you talking- Both. I think Section 3 and Section 7. And I think that this is laid out in our briefs, although it's a paragraph citing as a threshold issue, that if they got NEPA wrong, that is itself a Natural Gas Act claim. And they need to address, once they redo the NEPA, whether the newly described harms or the harm- you know, if that still means that the project is consistent with the public interest or not. Here, FERC does not say that these harms are de minimis. What FERC does- so there's something there. FERC never says, we found them insignificant, so they don't matter. FERC doesn't even say that they're insignificant for climate. So FERC is saying that there's something there. And FERC doesn't say- What is wrong with FERC's conclusion? What was arbitrary and capricious or legally erroneous, if you have the argument, about its conclusion that that is not enough to overcome the public interest way or to unbalance- overcome the presumption or unbalance- So our argument there is that FERC hasn't explained why this isn't like T-SPAN. Like, why aren't their harms- why aren't the harms here severe enough to justify rejecting a project, even if the exports that that project would enable would be consistent with the public interest? And the level of explanation you want is no different than a Section 7 explanation. Anytime someone comes forward with some material harms, which are probably going to happen in every one of these cases, they have to explain it. But that seems like- Well- Part of the problem is not so much that what FERC didn't say, but what FERC did say. Whereas here, FERC said, we aren't weighing these harms against benefits. We're not saying that these harms are worth it because the project is going to provide some benefit to the public that makes these harms worthwhile. So FERC said that explicitly and repeatedly. And the court needs to give- take FERC at its word for that. But they have the one footnote, which is- FERC did two passages in the August 2024 hearing. I also think if you look at overall what they did, they're doing what you want. They just didn't reach the conclusion you want. They're saying, here's the weight on one side. Here's what you guys have come forward with as concerns. We recognize there's going to be these harms, but we don't think they're as weighty a material as you do. And so the presumption's not overcome. Talk to me to see how that's not consistent with Section 3. I think the two FERC statements where FERC explicitly said we're not weighing, balancing, comparing whatever harms against benefits are important. I think also the fact that FERC refused to engage with any of our arguments about maybe exports in general. You know, maybe there's usually a bowling ball on the other side of the scale, but not in this case. And FERC said we don't care because that's not pertinent to our analysis. So I think it's both FERC stating that we're not doing balancing explicitly, and more than once, and FERC saying we don't care if you don't think that there are benefits for this particular project because we're not comparing harms against benefits, that affirms. But they are comparing harms against the presumption. And if all that FERC has is the presumption, I think FERC needs to provide some explanation or guideposts as to what it would take or how it is that this project is not, like, key span. Okay. I'm far over my time, and I do want to briefly address the Healthy Gulf. Why don't you wind up? Yes. So on the Healthy Gulf point, I just want to – our argument, and we're very clear about this in our plenary, is that FERC has some obligation to address cumulative effects for the compressor station. FERC argues that maybe modeling would be too expensive and not worth it. We didn't argue that modeling was the only way that FERC could have met its NEPA obligations for – but that given that FERC had already concluded that there was going to be an unhealthy cumulative air pollution problem, that FERC couldn't just refuse to discuss cumulative effects entirely there. So whether or not modeling would be too expensive is a bit of a red herring, because we think it's possible that FERC could have met its NEPA obligations doing something else. The problem is that FERC said we don't even care about cumulative effects. All right. Thank you. Thank you very much, Amar.
judges: Henderson; Millett; Ginsburg